All right. Our next case for argument is 23-2196, Eichengoinberry. Did I say that right? Etchgoinberry. Oh, man. It's not an easy one. Etchgoinberry v. United States. Mr. Klein, please proceed. Thank you. Good morning, Your Honors. May it please the Court, and thank you as well to the UNC Law School for hosting us. I'm Eric Klein on behalf of Plaintiff Appellants. I want to start with good news. This case has a complicated factual history, but I think it's actually easier on appeal than it seems. I want to use my time at the podium today to explain what I think are the simplest pathways through each issue to a disposition. The Court of Federal Claims in 2023 made two big mistakes. I'll briefly address each in turn, and then with the rest of my time, I'd like to address the key issue that the Court below did not reach in 2023, and that's whether the plaintiffs needed to allege affirmative lawful government acts and whether they did. Both parties today share the hope that this Court will address this question now and not wait for another years-long cycle of default. Wait, you think that we're going to address something that the lower court didn't rely on in making its opinion? Well, I think the Court can do so. I suggest that you talk about the errors in the actual opinion and not ask us to issue an opinion that the lower court hasn't passed on yet. I mean, you can use your time however you want, but I'm interested in hearing why the lower court erred and what it actually did. Certainly, I have enough material on that to fill my time in, so I can certainly do that, Your Honor. The two errors below, one was procedural, one was on merits. On the procedure, the Court below in 2023 reconsidered its own highly detailed decision from 2013, sua sponte, because a newly assigned judge thought the outcome should be different. I know, but this is your problem with this. Look, time limits under statutes of limitations are usually not jurisdictional nowadays. The Supreme Court has made that really clear over and over again in recent times, but this particular one in John R. Sand and Gravel, the United States Supreme Court said is jurisdictional and not waivable. If this is jurisdictional and not waivable, it is not like your typical statute of limitations, which the Supreme Court has generally said are not jurisdictional. This is jurisdictional and not waivable. Here, the Court of Federal Claims has a rule just like the Federal Rules of Civil Procedure. Every court in the country has this rule, in fact. That rule is when you have a question of subject matter jurisdiction, you can address it at any time. You can address it sua sponte. You must address it. It is a threshold issue that must be addressed of jurisdiction before you can get to the merits. So, I don't see what's wrong. I don't love it. I don't love that 10 years after this was thoroughly decided, another judge looked at it and went the other way. I think it's judicially inefficient and that's unfortunate, but the Supreme Court has held it jurisdictional, not waivable, which means it can be addressed at any time. So, what's the problem? Your Honor, the decision accurately characterized the decision in John R. Sand and Gravel, but there is a wrinkle. I actually, I accurately characterized it. Thank you. I'm really glad that I have your affirmation on that. Please continue. There's a distinction, Your Honor, and that is to be found in this court's case, Minuson v. McHugh. While John R. Sand and Gravel did say that the Tucker Act Statute of Limitation is jurisdictional and not waivable, it did not say that it therefore must be addressed at the front of the line like a constitutional standing issue. And so, this court in Minuson said the statutory statute of limitation is different than a constitutional standing issue. And for that reason, the holding in John R. Sand and Gravel did not mean that the court needed to address the stabilization issue, the statute of limitations issue, A, immediately, it did not, or B, to reconsider it in violation of the rules of this court on reconsideration. What is your other alleged error? The merits of the stabilization doctrine, Your Honor. Can you get to that? Of course. The Court of Federal Claims got stabilization right in 2013 and wrong in 2023. First of all, this is a stabilization case. It's a case about a taking by a slow and intermittent flooding, and that's a classic case. That was where the doctrine was invented in Dickinson, and that's still the classic use of the doctrine. So, the doctrine does apply, and the question for the court is, and where largely were the crux of the disagreement between the court below in 2013 and 2023 was when? When did that stabilization occur? When you say it's slow and intermittent, what's intermittent? It's regular, right? They irrigate the fields, and then the water doesn't drain away, and the land gets inundated with salt water that makes the soil unusable. Am I getting that right? Respectfully, not quite, Your Honor. There's two points to consider there. First, the hydrogeology of the underwater flooding is more complex than that. It has not been a simple, straightforward, regular movement of groundwater over the years. It is ebbs and flows, salinity ebbs and flows. It's more complicated, but what also makes this a stabilization case is not just hydrogeology. It's also mitigation and the promises of mitigation. So, on that level, this is... So, when they created this water district or whatever we're talking about in the irrigation program back in the 60s, they knew there was going to be a problem if it didn't drain, right? Yes. They knew that there would be a problem if it didn't drain. They knew this problem would occur, that the salt would destroy the soil, and so it was intended from the outset that there be a solution to this, and they started down that path, and that path and the drain they started to build ultimately caused other problems, right? Yes, there was... And so they stopped. That's correct. What's the actual taking you're alleging here? It's the taking of seepage and flowage easements by the United States, which is to say a flooding taking. That's what the taking is in all flooding cases. And to that point, Your Honor... No, but I mean, in those cases, it takes some physical property. What is the physical property being taken, and what is causing that property to be unusable for the owner's benefit and turned into basically public property? It's the taking of the agricultural land. The value of the agricultural land requires just compensation because it's being flooded from underground. So the Stabilization Doctrine would require that your clients file suit as soon as they knew that their land was, because of the government's action or inaction, was going to become unusable for its purposes of farmland. Respectfully, no, that's not what the Stabilization Doctrine says. Under Applegate, for example, the Stabilization Doctrine applies when it's uncertain when the permanence of the taking is in effect, when the taking has become permanent. It's not enough to say, for example, this dam will cause flooding. That's the case in all dam flooding takings cases. They know that the dam has flooded. It sounds to me like you're arguing for an indefinite, never ending statute of limitations because the government could always come in 20, 30, 100 years down the road and say, look, we know we've done this. It's created a problem. We're going to give you a solution now. And then that solution proves unusable and you come back and say, well, it didn't stabilize until they turned down the latest solution. Wasn't it true that at some point over the course of these years, it was pretty clear that the back and forth and said, yes, we're going to, no, we're not going to, yes, we're going to. I believe it was sometime in the early 2000s in the litigation, they specifically said, we have no legal obligation to do that. Isn't that a firm enough statement that, one, you knew your land was going to be destroyed by the saltwater? You knew that from the outset in the 60s that the government didn't construct some kind of drain. And two, the government told you at least as early as the early 2000s that they had no legal obligation to do that. Isn't that statement enough to make the claim stabilize? Your Honor, on the facts as to your latter point about the early 2000s, that's not an accurate characterization. Let's just assume it was. If the government said we have no legal obligation in 2002, then arguably that would stabilize the claim in 2002, but that isn't what happened. In the 2000, the Ninth Circuit affirmed that the government does have that obligation. And in fact, the United States concedes that in the 2000s, that's not when this claim stabilized because they say, we've been complying with the court orders in the Ninth Circuit. They've ordered us to study and provide drainage. We're doing it. We're in compliance. So they're not contending that this claim stabilized in 2002 or 03. They think it stabilized at some point before or when that order came down, but that order was an order to provide drainage. Okay, can I jump in? Yeah, yeah. So I guess I want to understand something. There's one thing I mean, I find these flooding cases, I find takings cases challenging, and I find water-related takings cases even more challenging. Let me ask you something. One of the things I've been thinking about is, isn't it possible that you could experience... I'm not saying what the facts of your case are. We're now going to talk hypothetical, so don't tell me these are not the facts of my case at any point in response to this series of questions. Okay. So isn't it possible that you could... Forget about what we're going to call stabilization doctrine. Isn't it possible that you could have flooding, right? And that flooding would cause damage to your land. And then you wait too long to bring your suit, you're outside the six-year statute of limitations. So you lose the right to sue the government for the damage that particular instance of flooding caused. But what if there was intermittent reoccurring flooding, let's say every three years, and it flooded again at a later point in time, now within the six years? You might not be able to get the damage that was caused by the first flood, because you didn't sue in a timely fashion. But can't you still get the damage caused by the second flood? So I guess where I'm going, I mean this is actually a friendly question, though it would for sure not give you the damages going back all the way. I hope your brain is quickly processing. This is a friendly question, but it wouldn't give you damages going all the way back, right? But isn't it possible that in cases when you have flooding, that you may lose out on some period to claim damages if you don't act quick enough. But later floods that are within the six-year period, that you could in fact get any damages for those specific acts. Isn't that possible? Couldn't that happen? It's not a tolling forever of your claim, but isn't it possible that later floods stand on their own as separate causal takings acts for which compensation could be obtained? Respectfully, Your Honor, I don't agree with that. Oh my God, that was a stupid answer. Go ahead. And I think my colleague in the United States is going to agree with me about this, that that isn't... Well, I know he's going to agree, because I just created a rule of law that makes him forever liable. I would create a rule of law that would help you, not give you as much as you want, but you're probably not getting that anyway. So you should think about what I'm saying. The stabilization doctrine under the Supreme Court's law in Dickinson, Your Honor, says that once the claim stabilizes from the taking, so... Right, that was a taking that occurred with the first flood. I'm saying why isn't a second flood that occurs three years later, which causes additional damage above and beyond the first flood, why isn't that a separate taking? I'm assuming in the hypothetical that it was the same taking, let's call it building of a dam, that caused the first flood, and the second flood, and the third flood. And if that's the case, that's a stabilization situation. And once the claim stabilizes, the statute runs and it doesn't... That bell can't be unrung. That claim for the taking associated with the building of that dam runs. And the claim is no longer available for future floods. But that isn't your claim. Now, I'm going to do what I said you couldn't do. So I'm going to say that's not your claim. But your claim is the government told us they were going to come in and do drainage. We've been waiting. We've been sitting here waiting for the government to come in and do its statutorily obligated drainage, and they haven't done it. And so each time they fail to fulfill their obligation of drainage, it is a separate taking for us. So each time that water floods our land and they don't drain it, it causes more damage to our land, we should be allowed to sue each time because those are separate acts of taking. I wouldn't mind that ruling, but it wouldn't be consistent with the Supreme Court's Dickinson holding. How so? Because the Dickinson holding suggests that for one event... You are swinging for the fences. You do not understand baseball, my friend. Baseball is won by base hits. It is not won by home runs, especially when you aren't going to get over that fence. I'm only trying to explain what I think the law is. I mean, it's the problem. Once the land is damaged by the salt, it's damaged. The continued irrigation is not going to change the damage. It's unusable. And that's the basis for your taking. It may be different than regular intermittent flooding based upon rainfall and stuff like that. If the land is polluted with salt, you can't use it. And that's at the very point where the land becomes unusable, starts the statute of limitations. Well, First Your Honor, I don't agree with that as a factual matter. You don't agree with anything. Can you just answer the questions? I understand you don't agree with the way we're proposing the questions. You are wasting all of your time by that. The land isn't permanently damaged by the salinity. Okay, that's important. So this land is not barren and there has been no determination. I know you are telling me there is no fact finding here that this land is barren and that it could not be rehabilitated with drainage in order to become, once again, fertile farmland. That's correct. Okay, I like that answer. I was happy to say that. So are pellets still able to grow crops on the land? Yes. Okay. And then what about, are you familiar with the Sumner-Peck sort of complaint and kind of parallels there? I'm not a master of it, but I am familiar. You have some familiarity to at least answer the questions. Would it be fair to say that the pellets land would have been somewhat similar to what happened with the Sumner-Peck plaintiffs in terms of what happened with their land? Do you feel like there are distinctions between what happened with their land? I think we don't know yet because there hasn't been discovery in our case to build that record. I'm not comfortable, as it stands here today, saying yes or no to that. I don't know the answer, respectfully, Your Honor. Was there certain discovery that you sought that would answer that question? We haven't sought a narrow jurisdictional discovery, if that's what you mean. We have asked the court to allow the claim to proceed to discovery where these questions are typically answered in takings cases. This Rule 12 disposition is unusual in a takings case. The Supreme Court has told us repeatedly that these are fact issues, and so typically they should be resolved on a factual record that hasn't been built yet here. I thought that there were statements made by you, and tell me if I'm misunderstanding this, that said there were uncontested facts here that allow this issue to be resolved. The party submitted a joint stipulation of facts in 2013, 2012. There was, I think, 26 pages of agreed facts, but we haven't done discovery. And do you agree that those agreed facts would allow us to resolve this particular statute of limitations issue? I do. I think Judge Horn in 2013 got it right on that agreed stipulation of facts, yes. Okay, let me ask the question again, because I just want you to answer my question. I know that you're trying to slide in your other stuff here, but... I'm doing my best to respond to your question.  Do you agree that the uncontested facts that were submitted allow the answer to be provided with respect to the statute of limitations issue? Leave out what Judge Horn decided or did not decide. Yes. Well, I need you to elaborate. I don't know what that means. What uncontested facts allow us to? Tell me what you think the uncontested facts are that allow this to be resolved. The facts regarding the decades-long back and forth about mitigation promises. Okay, so you're just focused on mitigation promises. The government came in and said, we're going to fix it, we're going to fix it, we're going to fix it, we're going to fix it, we're going to fix it, and then they never fixed it. In that sense, this case is applicant. That's what this court held in applicant, that repeated decades-long promises of mitigation meant the claim didn't stand up. Let me try one more time. Let's say we have all this water. It's causing damage. The government's supposed to fix it. They come in and they say, we're not going to fix it. Does your claim stabilize at that point? It could in that, yes. Depending on how they said it, it could, yes. Okay, so let's say the claim stabilizes. Your congressmen and women and senators get really, really upset with that statement and tell the government, go back and try again. Ten years later, the government says, well, we're going to take a look at it one more time. Does that restart the statute of limitations? No, no. Like any statute of limitations, once it runs, it runs. That's what I was trying to explain, Chief Judge, to you earlier, and I wasn't trying to argue with the court, but I do think under Dickinson, once a stabilization occurs, a claim accrues. I don't even know how you can argue this, since it's completely contrary to what you argued in your brief about Hansen and whether or not stabilization creates a mandatory must go to court or whether it permits the claimant to go to court. You argued the exact opposite in your brief of what you're saying now, and by the way, I agreed with it when you were talking about Hansen, so I don't know why you're standing there saying the opposite. It's maybe I haven't understood the court. I have not changed any of my positions from my brief. What your honor means is, if a claim doesn't stabilize yet, then we may still file. It is still timely. That's what Hansen says. It means there's no ripeness prior. Okay, let me just go back. I have one last factual question, and then we got to have you sit down, so we got to let government speak, but my last factual question is, are there still ... I mean, do you still want the government to come in and do drainage? Like, if they came in tomorrow and did drainage, would that improve the quality of your client's land? Yes. Okay. Thank you. Thank you. Thank you, your honor, and thank you to the law school for hosting these arguments. May it please the court. Andrew Bernie on behalf of the United States. This case is time barred. Plaintiffs filed their original complaint on September 2nd, 2011. That is, just to get the timeline straight, 44 years after Project Water was first delivered with no drainage. It is 35 years after drainage construction was suspended. When do you contend is the accrual date? I think there are a number of possible ... I think the most straightforward possible accrual date, your honor, and this is to your question about the Sumner PAC litigation, would be January 30th, 1991, the date of the complaint in that case. I would actually encourage the court to look at the complaint in that case. I think it starts at page 1109 of the joint appendix, so in that case, complaint filed more than 20 years before the complaint in this case is filed. You have members of plaintiff's proposed class, this is at 1113, saying lack of drainage is destroying lands, killing crops. They say at 1146, it's made their lands unmarketable, unfarmable, causing $1,000 per acre of damage. They say at 1151 that Interior has effectively stated that they will not implement the San Luis Drain or construct an alternative. Again, this is all more than 20 years, closer to 21 years before the complaint in this case was even filed. And Judge Hughes, to your question about the government's response to the litigation, it is actually, I think, in the 1990s, in response to this litigation and in the Fireball litigation, where we adamantly said that we had no duty to provide drainage or that any drainage obligation had been excused. Roughly what date do you think that was? That's ballpark, I mean. So the Sumner PAC opinion, I think, was in 1992. I think our district court briefing from the early 1990s, I don't think is in the record, but it would have been between... Okay, so what do we do with this? Just hear me out here. So you're saying, basically, we have no obligation to do this, we're not doing it. Okay, in the 90s. And that absolutely would have started the clock ticking. What happens when the Ninth Circuit comes back and says, oh, yes, you do have that obligation? At that point, doesn't it kind of reset the clock? Now, maybe they can't get damages going back to that earlier period, because what you're saying is exactly right, that they had all this time, they were on notice, other people brought their claims, but they didn't. But what about when the Ninth Circuit reset your obligation and said, oh, yes, you do have an obligation, and the government responded, okay, we'll comply with our obligation and faithfully tried to do so. From that point forward, don't they possibly have a reset of their clock, not for those damages from the earlier time period, but for any damages that occurred thereafter? Chief Judge Moore, I heard your question to my opposing counsel. I understand the question. I'm going to say no, but I'll say three things about that, I guess. First of all, the most... That was a very tentative no, I like it. Go ahead, keep going. So first of all, the most narrow answer to your question was the Ninth Circuit's decision was in 2000. As of 2003, a CFC judge said another takings claim was possibly already time barred. That was January 31st, 2003. Just to be clear, that's a CFC judge. I don't give a darn about that. Okay. That has no impact on me whatsoever. That's fair enough, Your Honor. By the way, if I was going to defer to that, I got two CFC judges saying the opposite in this case. Which one do I defer to? Point taken, Your Honor. Yeah, all right, go ahead. But the narrow answer to the question of the Ninth Circuit's decision was 2000. This was still 11 years after that. The other point... Okay, wait, so according to that answer, then your answer to me is actually, yes, Chief Judge Moore, it could reset our clock, but they still weren't timely. So your answer is no, it can't reset our clock. But that's not the right answer. Because the answer you just gave is, even if it did reset our clock, they still weren't timely, right? Is that a fair characterization? Well, my second answer... But is that a fair characterization of your argument? Yes or no? No. Okay, then explain to me what I got wrong on that. Because what I was going to say was, but we also don't think it reset their clock because... No, you said you have three separate arguments. I want to address each one in turn. I want to understand if your first argument does or does not logically result in a reset of their clock. No, because my first argument, which should have been my second argument, given your confusion, was that even if it did reset it, it was too late. Even if they did reset it. So your argument was not a rebuttal to the argument that it reset the clock. It was an even if it did reset it, they still lose argument. Okay, I should have given the first...  I should have... Yes, fair. I should have given my first answer, which is why we don't think it reset the clock, which I could try to give... No, you got two more swings of the bat. Yeah, yeah. Okay, but we don't think it reset the clock because we don't think at the end of the day, there are limited situations where litigation can serve to... Brought by other parties can serve to defer a claim. There's, you know, the American Pipe Doctor for a class action. But the point is, we don't think plaintiffs can rely on this other litigation. Sure, as a practical matter, if that resulted in programmatic improvements that adhere to their benefit. Here's the problem. Here's the problem. You're saying they can't rely on this. But what if the day after the Ninth Circuit says, government has got to fix this. They're like, beautiful, sold our land. New owners come in. They've bought this land subject to the belief that the government has to fix it. You're not going to be able to argue those people are time barred. So I don't think you're right on this as a logical legal point. Well, so if there were subsequent owners, and I'm not saying... Yeah, but they buy it in privity. So they get the same situation they had. You know this. So if they were not time... If they're time barred, the new people are time barred. They're not time barred, new people aren't time barred. Can't be that they're time barred, but the new people are not time barred. You follow what I'm saying here. I know you do. This doesn't work. Yeah, and so our first, our bottom line answer... Okay, so now we're on swing number three. Can I ask you on the first point that a court decision about a violation of statutory obligations, I assume you say, does not create a new takings cost of action. That may be a statutory violation, and if there's a cause of action under the statute, they could sue on that. But if the claim had stabilized, indisputably had stabilized well before the Ninth Circuit's decision, the fact that the Ninth Circuit told you you weren't complying with statutory law, in your view, does nothing to revive a takings claim. It may at best provide a basis for a statutory claim. Judge Hughes, I really wish I had given that response to Chief Judge Moore's question. Yes, I think that's right, and that does... And I understand you said you weren't interested in alternative arguments, but that does sort of feed into an argument that this plan really does sound in violation of a statutory obligation. Well, if you lose on the statute of limitations, I suspect the Court of Federal Claims is going to hear that argument. I don't want to hear it today. Okay, fair enough. Well, assuming your colleagues also don't want to hear it, that's a fair point. What was your number three? Because you had three points you wanted to make, or did you lose it? If you lost it, that's okay. I lost the third one, Your Honor. Do you contend that the stabilization doctrine applies here? No, we don't think it does for the reason... I mean, for two reasons. The first one is identified by Judge Hughes, we think, is that when you're talking about a flooding case, you're talking about... Or a flooding case or the other cases where it's been applied, you're talking about something that's intermittent or irregular. So it's unclear to a landowner that damage is being caused, that it's attributable to the government. But here, there's nothing like it. As Judge Summers observed in his opinion, these are regularly scheduled releases. It was very clear to the Sumner Peck plaintiffs in 1991 that it was causing damage to their lands. There's nothing uncertain about this. The second reason we don't think that the stabilization doctrine applies here is because where it has been applied, it's not just been applied on the basis of governmental promises. And here, we don't think you have it. It's been governmental promises combined with very slow, non-substantial encroachment of the land, such that the taking wasn't permanent. I mean, that's what you had in Applegate, where you had a very slow, imperceptible process, which combined with the government's promises to build a sand plant, held forth the possibility that the very minimal erosion could be reversed. Or in banks, when you had numerous efforts to deposit sand, deposit fine coarse materials, looked like it was working. Then when it realized it wasn't working, plaintiffs brought suit. Here, you just have- What is the overlap between what happened with the Sumner Peck plaintiffs and the appellants here? So, Your Honor, our central submission is if the Sumner Peck plaintiffs were saying 21 years before that, that their lands were rendered barren, causing massive damages, it was on them, if they're members of the same putative class, to explain why not just their lands were different, but all this lack of drainage for a period of decades didn't cause substantial encroachment. On the discovery point- I mean, that's the problem. The problem is you say it's on them. They didn't have a- They did allege this in their complaint, and they didn't have a chance to get to discovery. You may be right. If their lands are barren, and their lands are long ago barren, like before- They filed this in 2011, so that gives them back to 2005, right? So, if up until 2005, damage was still occurring thereafter- This guy stood here today and said, our lands aren't barren. We're still growing crops. He stood there at that podium and said that. Did you hear that? Yes, I did. And I have a response to that on the law and the facts. I mean, so on the law, I don't think it has to be barren for there to be a taking. The line this court drew in Bowling was the line between substantial encroachment in mere inches. That's on the law. And on the facts, I don't think there's anything in their complaint. It's their burden to establish timeliness. Explaining how this decades and decades of failure to provide drainage hadn't even led to substantial encroachment of their lands. I think that the crux of their complaint is otherwise. But there's certainly nothing in the complaint that- This is going back to the point that I- And kind of lucky for the plaintiffs in this case, I'm more concerned about the law than their arguments. And so what is- Why can't it be that iterative encroachment, even if regular, is an encroachment each time? And if there's new damage caused by each new encroachment, that damage is compensable. And the damage, the time for filing a claim is key to each new encroachment. Why isn't every time something occurs here that causes damage, a separate compensable taking? Because in flooding cases, what the court- The court has drawn a line like in the Idaker case, for example. I'm familiar with that one. I'm aware of that. But a single flood doesn't necessarily ripen a takings claim. But once you have the government action, you have substantial and frequent enough flooding, and it's clear that the government action is causing that and will cause that in the future, you have to bring the claim within six years after it accrues. Each additional flood doesn't- I don't think I agree with that. I don't think there's any law that says that. Tell me where there's a case that says that. And here's what I'm thinking. Loretto, go back to your old fashion, I came on your land and I put a cable box. Suppose I only did it for a week each year. I went on your land, I put a cable box every year at the same time. I did it December 1st through December 7th because that was for whatever reason I did. So I went on your land and every single year, like clockwork, I put a cable box on your land each year. I think that's- every one of those is an individually compensable taking. And I think the fact that you've done it for 10 years or 20 years doesn't somehow turn it into adverse possession that you don't get compensated for it. Now, I think you don't get compensated going back past the statute of limitations for the takings if you didn't bring them. But I think each new one, if it causes damage to you, if it's taking your property, is separately compensable. And whether true or not, they've alleged that your continued failure to drain and the continued flooding last year caused them more damage last year. So what do we do with that? That's a hard question. And the reason, and respectfully, I understand, the reason it's a hard question, I think, in my view, is because the allegations in this case, and I understand the court doesn't want to hear a separate argument on this, but the reason why I think it's a hard question to answer is you are talking about a multi-decade failure to take action. That's why it's difficult. I know, I know. And trust me when I say that I'm kind of with you on that point, but I also don't think I should address it, and I think the claims court should address it in the first instance if this goes back. But that being said, you know, I do think there is something to this iterative thing, and I don't think I want to mess the law up because I think that this kind of iterative taking could give rise to new damages, and whether true or not, there's no discovery, he's saying land's not barren every time they're doing it. And so I'm kind of, this case has been analogized to flooding, right? If this weren't inaction, but rather actual releases of the dam. Like that's, you know, I know that's not what this case is about, and I think you probably win on that second point when it goes back, but it would be really great to have somebody else flush it out first. Okay. I mean, isn't there a distinction between a bunch of discrete separate acts and the act here, which is failure to provide drainage? And sure, there's repeated attempts to provide it, but the actual taking is rendering the property unusable because of the failure to provide drainage. The fact that the damages may increase doesn't change the statute of limitations, it may change the scope of the damages. I think that's, I think I would, I think I would agree with that. I mean, the, I mean, failure to provide, again, failure to provide drainage is not an act in our view. I guess if I could, well, I understand- Can you actually answer my colleague's question about that specific going on the land once a year? Yeah. How would the government look at that? Because those do seem to be separate discrete taking. I, so- Is that, is that, is that- So I haven't had a physical, last time I thought in detail about physical takings was probably when I was in law school, but I mean, I think that the law is clear that in the case of a physical taking that it's ipso facto, any physical intrusion is a taking, so that probably would be separate. I think, I think the situation here is markedly different. I see I'm out of, I see I'm out of time. If there are any other questions. Thank you. Thank you, Your Honor. Very helpful. Will the court hear a brief rebuttal? Yeah, we'll give you two minutes. Did he go over his time, Robert? Yeah, two minutes. That's all, thank you. Two very quick points. Your Honor, there was back and forth just now about, frankly, the hydrogeology of this case, what the flooding is doing underground, how permanent the damages are. Those are questions that need to be explored in discovery. But you just told us when you were back up here the first time that the stipulated facts were sufficient to decide. You don't get it both ways. You don't get to say the stipulated facts are sufficient for us to win, but if the other side could win, then we want more discovery. What is it? If, because we think that the facts regarding mitigation promises are well in the record and we think that's sufficient for an Applegate-style stabilization, as did Judge Horn in 2013. But to the extent that the court is interested in the hydrogeology, as there was discussion just now, we can't guess at that. Those facts are not in the record. Secondly, my- So you're saying there are not facts in the record for us to make a decision of whether this case runs the same as the Sumner PEC? I'm not prepared to answer that about Sumner PEC, but I will try to answer it in a- Sumner PEC said, Lance Barron in 1990s, you know, here are all our problems. You're saying those, there are not facts in this record that analogize us to that. Correct. That record is not- So the two classes are completely distinct and not overlapping. I am not prepared to answer that at this time. I'm not familiar enough with the classes in Sumner PEC. So I don't want to speak wrongly to that. To the extent that the question though is, does the stabilization doctrine even apply? Because are these floods intermittent or recurring or steady? And the court was interested. Those are factual questions for discovery that are not yet in the record. I'll leave it there. All right. I thank both counsel. This case is taken under submission.